UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH M. BELL, | CASE NO. 1:23-CV-0256 |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Elizabeth Bell challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 9, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry of Feb. 9, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Ms. Bell filed for DIB on October 16, 2020, alleging a disability onset date of August 1, 2020. (Tr. 69). The claims were denied initially and on reconsideration. (Tr. 69-77, 80-88). Ms. Bell then requested a hearing before an Administrative Law Judge. (Tr. 107-09). Ms. Bell

1

(represented by counsel) and a vocational expert (VE) testified before the ALJ on February 4, 2022. (Tr. 32-68).

On February 14, 2022, the ALJ issued a written decision finding Ms. Bell not disabled. (Tr. 12-31). The Appeals Council denied Ms. Bell's request for review on December 14, 2022, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Bell timely filed this action on February 8, 2023. (ECF #1).

## FACTUAL BACKGROUND

### I.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Bell was 29 years old on the alleged onset date, and 31 years old at the administrative hearing. (Tr. 69). She has an associate degree. (Tr. 42). In the past, she worked part-time at a fast-food restaurant. (Tr. 43).

### II.  RELEVANT MEDICAL EVIDENCE

#### A.  Mental Health Impairments

Ms. Bell engaged in regular, twice weekly mental health counseling sessions in August and September 2019. (Tr. 283-312). After significant life events destabilized her family's living situation, she resumed counseling on August 7, 2020, presenting with a depressed mood and flat affect, but was oriented, displayed a logical thought process, and cooperative. (Tr. 313-14). She was diagnosed with bipolar disorder with psychotic features, post-traumatic stress disorder, and stimulant use disorder in early remission. (Tr. 316).

Ms. Bell attended counseling sessions from August 2020 through October 2021. (*See generally* Tr. 279-427, 646-824, 832-39). In early sessions, she presented as anxious with an elevated mood and reported difficulty with sleep and focus because she could not slow down. (Tr. 330,

336). She "crashed" at the end of August, causing her to feel more irritable and to sleep more. (Tr. 339). In later counseling sessions, Ms. Bell presented with moods described as anxious, irritable, and depressed. (Tr. 342, 345, 351, 354, 357, 363, 366, 369, 372, 380, 386, 389, 405, 408, 411, 414, 417, 426, 658, 664, 670, 673, 676, 682, 701, 707, 710, 716, 719, 722, 732, 735, 741, 744, 753, 756, 759, 762, 765, 768, 775, 781, 787, 793, 801, 810, 813, 816, 925, 828). She reported difficulty sleeping and focusing, nightmares, and hallucinations (auditory, visual, and tactile). (Tr. 345, 400, 658, 661, 664, 667, 673, 679, 696, 712, 722).

Ms. Bell also treated with psychiatrist Joel Steinberg, M.D. At the first session on October 12, 2020, Dr. Steinburg described Ms. Bell as "relatively well organized and coherent as well as informative." (Tr. 376). He rated her current mood as "normal" and found intact memory, insight, and judgment. (*Id.*). In a telehealth session with Dr. Steinberg on November 9, 2020, Ms. Bell was "reasonably cheerful and optimistic," laughed easily, talked a lot, and her memory was normal. (Tr. 400-01). She endorsed nightmares for which Dr. Steinberg prescribed Prazosin. (*Id.*).

On January 5, 2021, Ms. Bell stated that her nightmares were much better, and she was not having flashbacks during the day. (Tr. 654). Dr. Steinberg noted she was in a good mood and laughed often, displayed a congruent mood, and showed intact insight, judgment, and memory. (*Id.*). He increased Prazosin. (*Id.*). On February 23, 2021, Dr. Steinberg prescribed Risperdal for Ms. Bell's hallucinations. (Tr. 696-97). He described Ms. Bell as calm and forthcoming, with fair insight and judgment, and unimpaired memory. (Tr. 697). On March 29, 2021, Dr. Steinberg prescribed Seroquel for sleep. (Tr. 728). Ms. Bell was in a good mood and displayed good judgment and insight. (*Id.*). On May 18, 2021, Ms. Bell presented as hypomanic with a lot of laughter, rapid speech, and increased movements. (Tr. 771). She reported running out of Prazosin

the month before and could not contact the doctor for a refill. (*Id*.). She requested the doctor discontinue Seroquel and provide her with another prescription for Risperdal. (*Id*.). She endorsed holes in her memory for several days but was described as doing "reasonably well." (*Id*.). On June 14, 2021, Ms. Bell reported her psychotic symptoms cleared after resuming Risperdal, and she was sleeping better. (Tr. 796). Dr. Steinberg noted she was "much better" and increased Prazosin. (*Id*.). On September 14, 2021, Ms. Bell described intermittent auditory and visual hallucinations and a lapse of energy. (Tr. 832-33). Dr. Steinberg increased Risperdal and added Paxil. (Tr. 833). On October 5, 2021, Ms. Bell was described as "stable and doing well." Dr. Steinberg felt she had "smooth[ed] out again," and decreased the frequency of their sessions. (Tr. 836-37).

B. **Physical Impairments**

On September 16, 2020, Ms. Bell attended a new patient visit at University Hospitals to establish care. (Tr. 459). She described a history of attention deficit disorder, anxiety, depression, bipolar disorder, back pain, headaches, and seizures that present as staring spells. (*Id*.). Physical examination was normal. (Tr. 461). The provider referred Ms. Bell to a neurologist for evaluation of the staring spells. (Tr. 462).

On September 22, 2020, Ms. Bell met with neurologist Aamir Hussain, M.D., for evaluation of her staring spells. (Tr. 272-76). Ms. Bell described intermittent starting spells lasting a few seconds to a few minutes. (Tr. 274). Physical examination was normal, and she was interactive, cooperative, and displayed normal memory, attention span, concentration ability, and language. (Tr. 275-76). Dr. Hussain ordered an EEG and MRI to determine if the staring spells are related to complex seizures and referred Ms. Bell to a psychiatrist. (Tr. 272). The MRI was unremarkable. (Tr. 277).

On November 20, 2020, Ms. Bell returned to University Hospitals for an annual wellness visit. (Tr. 449). She complained of aching hands, left knee pain, and daytime sleepiness. (*Id.*). Gait, station, and muscle strength were normal, but Ms. Bell had tenderness to palpation of the lumbar spine. (Tr. 451). The nurse practitioner advised Ms. Bell to lose weight and quit smoking, referred her to physical therapy and chiropractic care, and ordered a home sleep study. (Tr. 449).

On December 7, 2020, Jonathan Macknin, M.D., evaluated Ms. Bell's hands. (Tr. 444). Dr. Macknin ordered a nerve conduction study to assess her for carpal tunnel and cubital tunnel syndrome. (*Id.*). On December 21, 2020, Ms. Bell underwent an upper extremity nerve study to evaluate the numbness and tingling in her hands. (Tr. 431-33). The study was consistent with bilateral carpal tunnel syndrome, moderate on the right and mild on the left. (Tr. 433).

On December 30, 2020, Ms. Bell met with Anna Serels, M.D. for evaluation of chronic low back pain, left knee pain, bilateral sacroiliac joint dysfunction, and bilateral carpal tunnel syndrome. (Tr. 434). Physical examination revealed full lumbar range of motion with pain on extension, significant bilateral SI joint tenderness with mild tenderness in the surrounding musculature, positive FABERs testing, and tenderness in the medial and lateral joint line of the left knee and tenderness over the distal iliotibial band insertion. (Tr. 439-40). Bilateral hand, lumbar spine, and sacroiliac joint and left knee X-rays were normal. (Tr. 466-69). Dr. Serels felt Ms. Bell's pain was consistent with lumbar spondylosis and reactive myofascial pain exacerbated by weight and felt her knee pain could be due to mechanical derangement, meniscus issue, or distal iliotibial band friction. (Tr. 434). She prescribed Topamax for back pain, referred Ms. Bell to physical therapy, and ordered X-rays. (*Id.*).

5

On January 27, 2021, Ms. Bell had carpal tunnel release surgery on the right hand. (Tr. 503). On February 10, 2021, Ms. Bell had carpal tunnel release surgery on the left hand. (Tr. 570). On February 3, 2021, Ms. Bell began physical therapy for back pain and generalized weakness. (Tr. 524). She was discharged from physical therapy on March 24, 2021, after largely achieving her treatment goals. (Tr. 599).

On May 26, 2021, Ms. Bell told Dr. Serels her pain was not as bothersome. (Tr. 848). On October 27, 2021, Ms. Bell met with Dr. Serels for worsening intermittent back pain and new neck pain. (Tr. 842). Physical examination revealed tenderness in the cervical paraspinal and scalene muscles bilaterally. (Tr. 846). Dr. Serels prescribed Robaxin for pain and suggested neck exercises. (Tr. 841).

III.   MEDICAL OPINIONS

State agency medical and psychological consultants reviewed Ms. Bell's medical records on initial consideration and reconsideration of her claim.

On January 29, 2021, a psychological consultant determined Ms. Bell was moderately limited in her abilities to interact with others; concentrate, persist or maintain pace; and adapt or manage oneself and mildly limited in her ability to understand, remember, and apply information. (Tr. 72). More specifically, the psychological consultant determined Ms. Bell was moderately limited in her ability to maintain attention and concentration for extended periods, perform activities on a schedule and maintain regular, punctual attendance, complete a normal workday without interruptions from psychologically based symptoms, interact appropriately with the public, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. (Tr. 74-75). The consultant determined Ms. Bell could perform routine activities

that do not require prolonged periods of sustained close focus and concentration or involve strict production quotas and deadlines, have superficial social interactions and occasional contact with the public, and perform routine tasks in a predictable setting where changes are infrequent and easily explained. (Tr. 75-76).

On April 20, 2021, a medical consultant determined Ms. Bell could perform medium exertion work; occasionally lift and carry 50 pounds, 25 pounds frequently; stand and walk for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; frequently climb ramps and stairs, stoop, and crawl; never climb ladders, ropes, or scaffolds, and avoid all exposure to hazards such as heavy machinery and unprotected heights. (Tr. 73-74).

On August 5, 2021, the psychological consultant reconsidered the medical evidence and adopted the prior psychological assessment. (Tr. 83). On August 23, 2021, the medical consultant adopted the prior medical assessment as well. (Tr. 85).

On September 15, 2021, Dr. Steinberg completed a mental impairment questionnaire. (Tr. 830-31). In describing clinical findings that demonstrate the severity of Ms. Bell's mental impairments, Dr. Steinberg noted her current stable mood, ongoing auditory and visual hallucinations, and mild paranoia. (Tr. 830). The rest of the questionnaire is in a check-box format. (*See* Tr. 830-31). Dr. Steinberg determined that Ms. Bell was limited but satisfactory in the following abilities:

- Carry out short, simple instructions and detailed instructions;
- Perform activities within a schedule;
- Manage regular attendance and be punctual within customary tolerances;
- Sustain an ordinary routine without special supervision;
- Perform at a consistent pace without an unreasonable number and length of rest periods;
- Remember locations and work-like procedures;

7

- Understand and remember very short, simple instructions and detailed instructions;
- Ask simple questions and request assistance;
- Adhere to basic standards of neatness and cleanliness;
- Be aware of normal hazards and take appropriate precautions; and
- Set realistic goals or make plans independently of others.

(*Id.*). Dr. Steinberg also concluded Ms. Bell was seriously limited, but not precluded from the following:

- Maintain attention and concentration for extended periods;
- Work in coordination with or in proximity to others without being distracted by them;
- Complete a normal workday and workweek without interruptions from psychologically based symptoms;
- Interact appropriately with the general public;
- Accept instruction and respond appropriately to criticism from supervisors;
- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- Maintain socially appropriate behavior; and
- Respond appropriately to changes in the work setting.

(*Id.*). Dr. Steinberg estimated Ms. Bell would be absent from work about 5 to 8 days each month and would be off task from performing job tasks for about 30% of the workday. (Tr. 831).

## IV.  OTHER EVIDENCE

Ms. Bell completed two Adult Function Reports, dated November 6, 2020, and January 7, 2021, describing how her conditions limit her activities. (Tr. 184-91, 214-21).

Initially, Ms. Bell endorsed anxiety, bipolar disorder with psychotic features, PTSD, and epilepsy, conditions that limit her ability to function during stressful situations and cause mood swings that are difficult to control. (Tr. 184). She has auditory and visual hallucinations, flashbacks of childhood abuse, and seizures (grand mal and waking). (*Id.*). Her typical "good" day revolves around caring for her daughter, cooking meals, and cleaning. (Tr. 185). On bad days, she stays in bed or on the couch and only does the bare necessities, such as responding to her daughter's

needs. (*Id.*). Ms. Bell's mother helps manage her daughter's schedule and transportation. (*Id.*). Her boyfriend helps manage her medical appointments. (Tr. 191). When depressed, Ms. Bell wears the same clothes for weeks, bathes infrequently, and eats constantly for comfort. (Tr. 185). When manic, Ms. Bell changes her clothes multiple times a day and can go all day without eating. (*Id.*). She needs reminders to care for herself and take her medications. (Tr. 186).

Ms. Bell enjoys cooking homemade meals, can perform household chores, and likes to read, draw, crochet, and write. (Tr. 186, 188). On bad days, she makes simpler meals and does not do any chores or engage in any hobbies or activities. (*Id.*). Ms. Bell enjoys being alone but needs to have someone with her in a crowded area. (Tr. 187). She has daily contact with neighbors and spends time with others but is avoidant on bad days. (Tr. 188). Ms. Bell estimated she can walk about a mile before needing to rest and can follow short spoken instructions. (Tr. 189). She has been fired from several fast-food restaurants for not getting along with her bosses. (*Id.*). When she is stressed, she gets moody, screams, cries, and gets mad. (*Id.*).

In January 2021, Ms. Bell reported having anxiety about unknown people in large groups, ADD that limits her ability to focus and stay on task, auditory and visual hallucinations, and an inability to function around people who cause flashbacks. (Tr. 214). She cannot keep a schedule, has difficulty distinguishing reality from hallucination, and has nightmares. (Tr. 215).

In November 2021, Ms. Bell's mother completed an Adult Function Report that paints a similar picture. (Tr. 260-67). She explained that Ms. Bell has difficulty focusing on tasks for long periods of time, quits or gets fired from a job when she becomes overwhelmed, and does not handle pressure well. (Tr. 260). Ms. Bell sleeps too much when depressed or overwhelmed, sleeps too little at other times; does not change clothes and needs reminders to perform self-care,

sometimes needs help from her boyfriend to complete household chores and care for their daughter, needs step-by-step instructions repeated, rebels against authority figures, and fears crowds. (Tr. 261-67).

## V.    ADMINISTRATIVE HEARING

On February 4, 2022, Ms. Bell participated in a telephonic hearing before the ALJ. (Tr. 34). She lives with her boyfriend of three or four years and her three-year old daughter. (Tr. 41). Ms. Bell's boyfriend works two days a week. (Tr. 44). When he is not home, Ms. Bell relies on the building manager for support and supervision. (*Id.*). Ms. Bell's boyfriend reminds her to handle self-care tasks, such as brushing her teeth and showering. (*Id.*). They work together to get her child up and dressed. (Tr. 45). They also split the household chores, though Ms. Bell's boyfriend does 60-75% of the work. (Tr. 46). She has difficulty completing tasks due to issues with attention and focus. (Tr. 47).

Ms. Bell regularly sees her mother and stepfather once a week and more often if she needs to help run errands for them. (Tr. 45). She spends free time reading, doing arts and crafts with her child, watching television, and playing video games. (Tr. 45). During the summer, she and her daughter play outside. (Tr. 45-46). She struggles to engage in these activities when she is feeling very distractible or depressed. (Tr. 55-56).

Ms. Bell cannot work because of her fluctuating mood, hallucinations, and the attendant difficulties interacting with coworkers and customers. (Tr. 43). At least once a week, Ms. Bell has so little drive or motivation that she lies in bed all day. (Tr. 56). She describes these days as "noisy," where everything in her head feels "super loud." (*Id.*). She can sit and stand comfortably for about 30 to 45 minutes each, walk for 20 to 30 minutes, and lift between 25 and 30 pounds. (Tr. 47-48).

She has constant pain in her mid to lower back and left knee. (Tr. 48). With medication, her pain is typically four on a ten-point scale; without medication, the pain increases to six. (Tr. 49).

Ms. Bell described experiencing less frequent mood cycling, less severe moods, and fewer hallucinations since August 2020. (Tr. 49-50). However, during periods of mania, she has a decreased need for sleep, cleans a lot around the house, and becomes more animated and excitable. (Tr. 58). After periods of mania, she crashes and needs sleep to recuperate. (Tr. 59). Stress aggravates her physical and mental health symptoms, but her daughter's presence helps to ground her; for instance, when Ms. Bell has an anxiety attack, her daughter helps her to focus on something other than the anxiety. (Tr. 50). Anxiety attacks typically occur once or twice a week, or even once a day if Ms. Bell is more stressed. (Tr. 50-51). During an attack, Ms. Bell feels as though she cannot breathe and her mind races. (Tr. 51). The attacks last anywhere from 5 to 25 minutes and she typically takes a half-day to recover from them. (*Id.*).

Ms. Bell experiences auditory and visual hallucinations. (Tr. 51-52). The auditory hallucinations—knocking at the door, whistling, banging, and car horns—occur more frequently than the visual hallucinations. (Tr. 54). The noises drown out everything around her, including the television and conversation, and interfere with her ability to concentrate. (Tr. 54-55). About once a month, Ms. Bell experiences tactile hallucinations, as if bugs are crawling over her skin. (Tr. 55).

Starting in September 2021, Ms. Bell experienced a seizure every two weeks; they inexplicably stopped in December 2021, and she has not had any seizures since then. (Tr. 53). She also had symptoms associated with bilateral carpal tunnel syndrome until she underwent surgical

releases in January and February 2021. (Tr. 53-54). Since then, she has not had any issues with her hands. (Tr. 54). Ms. Bell does not experience negative side effects from her medication. (Tr. 47).

Ms. Bell has an associate degree in psychology but has not worked full-time. (Tr. 42).

The VE then testified that a person of Ms. Bell's age and education, with the functional limitations described in the ALJ's RFC determination, could perform light, unskilled work such as a Housekeeper, Mail Clerk, or Price Marker. (Tr. 63-64). The VE also testified that employers tolerate up to ten percent off-task time and one monthly absence on average. (Tr. 64). It would be work preclusive if the individual could not perform work-related tasks for at least a two-hour period. (Tr. 65).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Bell had not engaged in substantial gainful activity since the alleged onset date. (Tr. 17). At Step Two, the ALJ identified the following severe impairments: seizure disorder, bilateral carpal tunnel syndrome status/post releases, obesity, bipolar disorder, depression, PTSD, and stimulant use disorder. (*Id.*). The ALJ determined Ms. Bell's knee and back pain were not severe because the conditions were "being managed medically and should be amenable to proper control by adherence to recommended medical management and medication compliance." (Tr. 18). The ALJ noted Ms. Bell's normal X-rays, successful discharge from physical therapy, and dearth of aggressive treatment. (*Id.*).

At Step Three, the ALJ determined Ms. Bell did not have an impairment or combination of impairments that meets or medical equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ specifically addressed Listing 11.02

13

(epilepsy) and Listings 12.04 and 12.15 (both relating to mental health conditions). (Tr. 18-19). Regarding Listing 11.02, the ALJ concluded Ms. Bell did not meet the criteria of subsection A because she did not have seizures occurring at least once a month for three consecutive months. (Tr. 18). The ALJ also found Ms. Bell did not meet the criteria of subsection B because her seizures did not occur at least once a week for three consecutive months, nor did she meet the criteria of subsections C or D because she did not have a marked limitation in physical functioning; understanding, remember, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing herself. (Tr. 18). As to Listings 12.04 and 12.15, the ALJ concluded Ms. Bell had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (Tr. 18-19).

Before proceeding to Step Four, the ALJ reviewed the medical records, function reports, administrative hearing testimony, and medical opinions and determined Ms. Bell has

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e., assembly line work); limited to work-related decisions in using her judgment and dealing with changes in the work setting; and able to occasionally interact with supervisors and coworkers and never interact with the public.

(Tr. 19-20).

At Step Four, the ALJ determined Ms. Bell does not have any past relevant work. (Tr. 26). At Step Five, the ALJ concluded Ms. Bell can perform jobs that exist in significant numbers in the national economy. (*Id.*).

14

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### DISCUSSION

Ms. Bell brings three issues for review:

1. Whether the ALJ erred at Step Two by finding her knee and back pain non-severe and subsequently failing to consider the impact of those non-severe impairments when assessing her residual functional capacity.

2. Whether the ALJ erred at Step Three in his evaluation of Listing 12.04

3. Whether the ALJ erred in his evaluation of Dr. Steinberg's medical opinion.

(ECF #9, PageID 917-18, 920-22, 925-27). I address each in turn below.

**I.    The ALJ's non-severity findings are supported by substantial evidence and the ALJ appropriately considered the non-severe impairments when assessing Ms. Bell's RFC.**

Ms. Bell argues the ALJ should have treated her knee and back pain as severe impairments because they impose more than a *de minimis* effect on her ability to perform basic work activities. (*Id.* at PageID 917). She further claims the ALJ did not consider the impact of her non-severe impairments when assessing her RFC as the regulations require. (*Id.* at PageID 918). The

16

Commissioner counters that the ALJ considered Ms. Bell's severe and non-severe impairments in the remaining steps of the evaluation. (ECF #12, PageID 948).

At Step Two, the Commissioner must determine whether the claimant has a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii). This is a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (internal quotation marks and citations omitted), intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). A severe impairment is one that has "more than a minimal effect" on the claimant's ability to do basic work activities. SSR 85-28, 1985 WL 56856, at *3. After an ALJ finds even one alleged impairment to be severe, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5. Therefore, even if the ALJ errs by failing to find a particular impairment severe at Step Two, the error is harmless if the ALJ considers all the individual's impairments in the remaining steps of the disability analysis. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ found Ms. Bell's back and knee impairments not severe but considered those non-severe impairments when assessing her RFC. For instance, the ALJ acknowledged and summarized the medical evidence documenting Ms. Bell's treatment (Tr. 22-23), and later stated:

> Physically, the claimant testified that she experienced 1 seizure/every 2 weeks from 9/21-12/21. She testified they have now stopped. The claimant has a BMI around 47, and had bilateral carpal tunnel releases. These findings support the less than light exertional level, with the postural and limitations supported by the combination of the claimant's impairments. The claimant's bilateral carpal release history supports the light exertional level in terms of lifting and carrying. However, manipulative limitations have not been added. The claimant testified that she no longer has any issues with her hands following her CTS releases. Following the surgeries, the record did not note any manipulative limitations. The claimant noted no difficulty holding objects, writing, or pain in her hands, wrists, of fingers. There were no positive Tinel's

17

tests. In March of 2021, she had some general back pains, but denied other physical complaints, and did not note any difficulty with her hands.

A more limited physical RFC is not warranted. X-rays of the lumbar spine, and left knees, were taken in December of 2020. They were all normal. On March 24, 2021, the claimant was discharged from physical therapy for lower back pain, where it was noted that the claimant had fully met goals (but pain was partially met). The claimant had not gotten an EEG done despite it being ordered. On exam, the claimant's back/spine had symmetric posture, no erythema, edema, or swelling. Full lumbar range of motion with provocation of pain symptoms mostly upon extension, was noted. There was significant tenderness over both SI joints, and mild tenderness in the surrounding musculature. Straight leg raise was negative bilaterally. Sitting slump test was negative bilaterally. Exam of the left knee there was medial and lateral joint line tenderness. Here was no effusion or erythema. There was no crepitus. Strength in the lower extremities was 5/5. Sensation was intact. Gait had a normal base, and was non-antalgic. She was able to toe walk and heel walk without difficulty.

(Tr. 25). Even if the ALJ's finding of non-severity was not supported by substantial evidence, the ALJ considered Ms. Bell's severe and non-severe impairments as part of the RFC assessment; therefore, the ALJ did not err at Step Three. *Maziarz,* 837 F.2d at 244.

Ms. Bell next argues the ALJ found obesity to be a severe impairment but did not consider the impact her obesity had on her knee and back pain; namely, that it interfered with her ability to sit, stand, and walk and to perform activities of daily living. (ECF #9, PageID 917). This argument does not withstand scrutiny because, as the Commissioner correctly notes, the ALJ adequately considered how obesity affects her other impairments. (ECF #12, PageID 949) (citing Tr. 23-25, referring to Tr. 439, 451, 461, 866). Moreover, the ALJ determined Ms. Bell's BMI supports "the less than light exertional level, with the postural and limitations supported by the combination of [Ms. Bell's] impairments." (Tr. 25). In the Sixth Circuit, an ALJ's express reference to the "combination of impairments" is sufficient to demonstrate the ALJ properly considered the combined effects of a claimant's impairments. *See Loy v. Sec'y of Health & Human Servs.,* 901 F.2d 1306, 1310 (6th Cir. 1990) (stating that an ALJ's individual discussion of multiple impairments

18

does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a "combination of impairments" in finding that the plaintiff does not meet the listings). Finally, I note the ALJ relied on treatment records indicating Ms. Bell was, indeed, independent in all activities of daily living, mobility, and driving. (Tr. 23).

I find the ALJ sufficiently considered the combination of Ms. Bell's severe and non-severe impairments. I recommend the District Court decline to remand on this basis.

## II. Substantial evidence supports the ALJ's conclusions at Step Three.

Ms. Bell argues the ALJ's mental health listing paragraph B conclusions were not supported by substantial evidence and medical documentation supported serious limitations in interacting with others, concentration, persistence, and pace, and managing herself. (ECF #9, PageID 925-26). The Commissioner replies that the ALJ's paragraph B determinations were consistent with objective medical evidence, including the state agency psychological consultants' opinions. (ECF #12, PageID 951).

The State agency psychological consultants determined Ms. Bell was moderately limited in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 72, 82). The ALJ came to the same conclusions and articulated the following:

> In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that she has difficulty engaging in social activities and getting along with others. However, according to her statements, the claimant is also able to spend time with friends and family and live with others. Finally, the medical evidence shows that the claimant was described as pleasant, cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments.

> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations. The claimant contended that she has limitations in focusing generally, completing tasks, and maintaining a regular work schedule. On the other hand, the claimant said that she is also able to prepare meals, watch TV, read, and handle her own medical care.

> Finally, the claimant has moderate limitations in her ability to adapt or manage herself. The claimant asserted she has difficulties managing her mood. That said, the claimant also stated that she is able to handle self-care and personal hygiene and care for children. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, and normal mood and affect.

(Tr. 18-19).

As to interacting with others, Ms. Bell claims the ALJ did not cite any evidence supporting his conclusion. (ECF #9, PageID 925). Ms. Bell also argues "contrary to the ALJ's findings, the actual evidence in this matter established that [she] was seriously limited in her ability to function independently, appropriately, and effectively on a sustained basis," citing numerous instances when she presented with an anxious, irritable, or depressed mood and her reports of nightmares, weekly hallucinations, and difficulty sleeping and maintaining focus. (*Id.* at PageID 926).

To Ms. Bell's first assertion, the decision explicitly cites evidence of her ability to interact with others. (*See* Tr. 18-19) ("[A]ccording to her statements, the claimant is also able to spend time with friends and family and live with others. . . . the claimant was described as pleasant, cooperative, had good interactions with non-medical staff, and appeared comfortable during appointments."). As for her second argument, Ms. Bell does not allege the ALJ failed to consider the evidence she cites as support for her own conclusions that she is more than moderately limited; rather, she would have this Court reweigh the evidence and come to a different conclusion. (*Compare* Tr. 18-19 *with* ECF #9, PageID 919-22). But on appellate review, this Court's narrow task is to determine whether substantial evidence supports the ALJ's conclusions and whether the ALJ applied the proper legal standards; this Court does not review the evidence *de*

20

*novo*, make credibility determinations, or weigh the evidence. *Walters,* 127 F.3d at 528; *Brainard,* 889 F.2d at 681.

Because the ALJ cited substantial evidence supporting his paragraph B conclusions, I recommend the District Court decline to remand on this basis.

### III. The ALJ evaluated Dr. Steinberg's medical opinion in accordance with the regulations and his findings are supported by substantial evidence.

Finally, Ms. Bell claims the ALJ did not sufficiently articulate how he considered the persuasiveness of Dr. Steinberg's medical opinion; she argues the doctor's opinion is consistent with and supported by the mental health treatment records. (ECF #9, PageID 922). The Commissioner argues the ALJ appropriately considered Dr. Steinberg's opinion in the context of supportability and consistency. (ECF #12, PageID 957-58).

Because Ms. Bell filed her application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.,* No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given

21

to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(a). An ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Ms. Bell does not argue the ALJ failed to consider the factors of supportability and consistency; instead, she says the explanation for his conclusion "was contrary to the evidence" and "not supported by substantial evidence." (ECF #9, PageID 922). On this issue, the ALJ states as follows:

> The checkbox form completed by Dr. Joel Steinberg is unpersuasive. The form checks boxes noting that the claimant is either "limited but satisfactory" and "seriously limited, but not precluded," in a variety of mental functional areas. The form lacks any narrative or explanation for the claimant's limitations, besides, "ongoing auditory and some visual hallucinations, mild paranoia." Additionally, the form is internally inconsistent, as Dr. Steinberg notes that the claimant's mood was currently stable, but notes serious limitations. While Dr. Steinberg has a special relationship with the claimant, the vague nature of the checklist form, as well as the lack of explanation, render this form unpersuasive.

(Tr. 24). Ms. Bell takes issue with the ALJ's conclusion that Dr. Steinberg's opinion was internally inconsistent. (ECF #9, PageID 920) ("[A] stable mood does not that she did not have symptoms. Rather, Dr. Steinberg indicated that she had continuing symptoms of paranoia, auditory hallucinations, and visual hallucinations.").

22

Internal inconsistency can be an adequate basis for rejecting a medical opinion. *See, e.g.,* *Norris v. Comm'r of Soc. Sec.,* 461 Fed. App'x 433, 440 (6th Cir. 2012). In this case, the ALJ determined Ms. Bell's currently stable mood was inconsistent with the serious limitations Dr. Steinberg opined. This is supported by substantial evidence in the record, including Ms. Bell's self-report that she was comfortable and aware that she was no longer depressed, Dr. Steinberg's decision to reduce the frequency of Ms. Bell's visits, "generally normal" mental status evaluations, logical thought processes, cooperative behavior, and better sleep. (Tr. 24-25).

Clear from the decision, the ALJ recognized Ms. Bell was not symptom-free:

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by both the objective and subjective medical evidence of record. Mentally, the claimant complained of having auditory and visual hallucinations, and continued complaints of depression. The claimant noted increased stress at time, as well as an anxious mood. These findings support the moderate mental limitations listed above. However, a more limited mental RFC is not supported by the record. Mental status exams were generally normal. The claimant's thought process was logical, and her behavior was cooperative. Her thoughts were clear. The claimant noted that she was sleeping much better with Risperdal. On October 5, 2021, the claimant noted that she finally "smoothed out." The claimant noted that she was comfortable and aware that she was no longer depressed. The examiner changed the frequency of the claimant's visits to every two months.

(Tr. 25). Indeed, the ALJ noted Ms. Bell continues to have symptoms, including hallucinations, anxiety, and depression, but the citation to hallucinations and paranoia alone do not support the finding of serious limitations. Ms. Bell has not identified an error in the ALJ's finding of internal inconsistency.

Ms. Bell next takes issue with the ALJ's conclusion that the checkbox form was vague and lacked adequate explanation for the limitations. But "[m]any courts have recognized that [ALJs] may properly give little weight to a . . . check-off form of functional limitations that d[oes] not cite

clinical test results, observations, or other objective findings." *Stewart v. Comm'r of Soc. Sec.*, 811 F. App'x 349, 353 (6th Cir. 2020). Here, Dr. Steinberg cites only Ms. Bell's reported symptoms (*see e.g.*, Tr. 333, 696, 712, 833) and offers no citation or discussion of test results, observations, or objective findings. As such, Ms. Bell has not identified an error in the ALJ's discussion of supportability.

Finally, Ms. Bell lists all the findings and reported symptoms stemming from her counseling sessions and argues the records support and are consistent with Dr. Steinberg's opinion. (ECF #9, PageID 922-23). Again, the Court is not to review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Walters*, 127 F.3d at 528; *Brainard*, 889 F.2d at 681. She has identified no basis for me to recommend the District Court remand, and I decline to do so on this issue.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: December 28, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.**

Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.,* 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green,* No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard,* 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega,* 924 F.3d 868, 878-79 (6th Cir. 2019).

25